## Case No. 5,938.

### HALL v. KIMBARK et al.

[6 Chi. Leg. News (1874) 306.]

Circuit Court, E. D. Missouri.

SALE—OFFER BY CIRCULAR—ACCEPTANCE.

[Sending a circular naming "present price" of an article is an offer to sell at that price, and an order based thereon, sent upon the receipt of the circular by one of the parties to whom it was addressed, if reasonable in amount, is an acceptance of the offer, and the contract is complete when the order is received.]

On or about the 5th day of February, 1873, Hall, Kimbark & Co., wholesale iron merchants of Chicago, caused to be published the following:

"Our present price for blue seat springs is as follows: On orders for 100 pairs and over in one shipment:

1¼x2x24 inch,
1⅜x2x25 " } $1.00 per pair.
1½x2x26 "

"We continue the warranty, and for every spring which may fail from fair ordinary usage, we will furnish a new one. All sales at the above price will be for cash on receipt of invoice, or within 15 days. Hall, [Seneca D.] Kimbark & Co. Chicago, Feb. 5, 1873."

—Of which, by direction of that firm, from 3,000 to 5,000 copies were distributed to the hardware and iron trade in the Northwest. These price lists or circulars were so distributed by clerks of the firm, under its instruction to make such distribution general, and from lists prepared from books of the commercial agencies, or for the general purpose of issuing circulars by such clerks. They were mailed in an open envelope, to the address of the persons named in such lists. One copy in such course, came to the hand of George D. Hall, wholesale iron merchant of St. Louis. Upon its receipt, and on the 8th day of February, 1873, George D. Hall caused to be sent to Hall, Kimbark & Co., the following telegraphic order:

"St. Louis, Feb. 8, 1873. Mess. Hall, Kimbark & Co.:—Ship me two thousand pairs one and a half, one thousand pairs one and three-eighths Jenk's seat springs at one dollar. Answer. Geo. D. Hall."

This dispatch was received on the day of its date, and to the same the following reply was sent by mail on that day:

"Chicago, Feb. 8, 1873. Geo. D. Hall, Esq., St. Louis, Mo.: Dear Sir:—We are in receipt of your telegraphic order for 3000 pairs of seat springs, which being for a speculative quantity, we have submitted it to the manufacturers, who have an agency in your city, and may be affected by an overstock in your market. If they consent, we will ship them to you on following conditions: First. That they are declared by you to be bought for your own legitimate sales. Second. That none of them shall be sold or delivered to any manufacturer of seat springs, nor to any of their agents or representatives. Third.

That when springs are advanced you will promptly follow; and that the springs you buy from us shall not be used to undersell us. Our opinion is that there is no speculation in seat springs at this price, for it will probably hold a year, and knowing this, you may prefer to buy in smaller quantities. Our motive in placing them at a dollar is of course, a selfish one, and we propose to manage this affair so that the benefit shall fall in our own lap. Our precautionary measure may be unnecessary for your case, but before our circulars were mailed, our neighbors commenced a speculative run on us for springs, which we are obliged to check or defeat our own object. Yours respectfully, (Signed) Hall, Kimbark & Co."

The letter last referred to elicited the following reply by mail, which was received on the 11th day of February, 1873:

"St. Louis, Feb. 10, 1873. Messrs. Hall, Kimbark & Co., Chicago. Gentlemen: Yours 8th duly received. In reply we beg to state that the order, 3000 pairs springs, is made in good faith, and for our own legitimate sales in regular business, and not for account profit, purchase, or interest of any other person or persons whatever. We beg further to state that any advance that may take place in springs, will be taken advantage of by us for our own profit. Should springs advance to-morrow, we will likewise advance. Your circular was a free and open offer, without any reservations such as you now name; immediately upon receipt of which we entered the order; we have therefore a right to expect execution of same. The quantity ordered we do not think looks very much like anything suspicious, or like bad faith on our part; we are at least able to state that we made the order in the most perfect good faith, and for our own legitimate wants, which exceed 3000 pairs per six months. We suppose your circular to have been sent to us in perfect good faith; was it not? Very truly, Geo. D. Hall. We freely agree not to hand over or sell any of your springs to any manf. of springs—this addition to what we have written may be unnecessary. G. D. H."

Prior to the receipt of the above letter and on the 10th day of February, 1873, Hall, Kimbark & Co. mailed to George D. Hall the following, which was received by him on the following day:

"Chicago, Feb. 10, 1873. Geo. D. Hall, Esq., St. Louis, Mo. Dear Sir: We learn to-day that you have a contract with Messrs. P. & W., of this city, for 4,000 pr. seat springs, for this year's delivery, which is about double the quantity which you bought last year. Therefore we conclude that you will not expect us to ship the springs after you receive our letter of Saturday. We inclose telegram from the prest. of Cleveland Spring Co., in reply to our dispatch, asking whether we should accept your order. Yours truly, Hall, Kimbark & Co."

Telegram enclosed: "Cleveland, O., Feb.

8, 1873. Hall, Kimbark & Co.: Telegram received. Would advise not to sell; think it speculation. E. H. Bourne."

Other correspondence subsequently passed between the parties, but none of such character as to vary or modify the positions which they occupied on the 11th day of February, 1873. Subsequent to the issuing of the circular of February 5, 1873. the firm of Hall, Kimbark & Co. filled numbers of orders received in response thereto, selling in one week 32,000 pairs, and one which exceeded the amount mentioned in Hall's telegram. Hall, Kimbark & Co. could have filled his order if they had wished. The market price of seat springs at Chicago on and after February 14th, 1873, was about $1.45 per pair; prior to that date it remained at $1. The foregoing are the substantial facts of the above entitled case as they were shown upon the trial. Testimony of several leading Chicago merchants, to the effect that the custom of merchants was to accept or decline orders based upon similar circulars for such reasons as might prompt themselves, was excluded by the court as irrelevant to the issue.

TREAT, District Judge (charging jury). By the circular sent to plaintiff, Hall, Kimbark & Co. offered to sell to the plaintiff the articles mentioned on the terms therein stated. If in reply thereto the plaintiff ordered 3,000 pairs of springs on the terms stated, and if Hall, Kimbark & Co. had that amount on hand at the receipt of the order, and said amount ordered was not unreasonable, considering the trade in which said co-partnership was engaged, then said order of the plaintiff, when received, was notice that the offer by circular of Feb. 5th, 1873, had been accepted, and the contract was then complete. It was competent for the parties thereto afterwards to modify the terms, and if no such modification was made, then the plaintiff was entitled to receive the 3,000 pairs at the price stated in the circular of Feb. 5th, 1873. For a breach of the contract the measure of damages would be the difference between the contract and the market price of the springs. By "market price" is meant that at which plaintiff could have bought the same at the time of the final refusal to deliver, or within a reasonable time thereafter, in the open market.

And upon which a verdict for the plaintiff of $1350 was rendered. Upon overruling the motion for a new trial, Judge TREAT, without giving reasons, adhered to his former rulings.

Where the contract of parties has been expressed in writing, courts do not suffer the terms of the instrument to be varied or modified by parol or extrinsic evidence. This is a familiar rule of law applicable in all courts, and needs no citation of authority to support it. Equally familiar and sustained is

the rule that where, in a written contract or instrument, ambiguous or technical words or phrases are used, resort may be had to oral proof to explain them—not to vary or change. They stand as used, but their meaning may be the subject of inquiry. And upon such inquiry, the circumstances under which the terms were used, the purpose to be reached by the use of them may be shown. Having these rules in mind, the first suggestion upon reading the circular of February 5, 1873, is, are the words "our present price," as therein used, ambiguous, or have they a defined and settled meaning? For example, B writes to A, "At what rate will you sell me wheat?" A, in reply, writes, "My present price is $1.00 per bushel." In such case the language of A construed in reference to that of B is an offer to sell. On the other hand, B writes to A, "What are the rates at which wheat is selling?" A, in reply writes, "Our present price is $1.00 per bushel." A's reply is simply a quotation; he does not offer to sell, and it is not certain whether or not B wishes to buy or sell. The term then has no absolute import, its meaning depends upon the circumstances attending its use, and is therefore a subject of inquiry and explanation.

When, as in this case, used without reference to any former act or communication, when not addressed exclusively to one person, when issued in a public or general manner, when the instrument containing it falls into the plaintiff's hands as one of many, without immediate design on the part of the defendants, it was at least the duty of the court to submit to the jury the question of whether the circular constituted an offer on the part of Hall, Kimball & Co. to sell to Geo. D. Hall. It is perhaps more reasonable to say that it having been shown to be a mere circular, the court should have instructed the jury that as a circular according to universal mercantile custom and practice, it should not, in the absence of aiding circumstances, be construed as an offer. To those accustomed to the ordinary newspaper advertisements, to the current quotations or lists issued by houses at centres of trade, this circular would in general have but suggested an intent to state the condition of the market as "we are selling;" "we quote," "we note the rate," and as furnishing a basis for a direct negotiation to be opened and consummated if both parties should thereafter concur. Hall, in his letter of Feb. 10, in which he twice refers to it as "your circular," evidently understood its character; yet the court allowed the jury to consider none of the conditions; to weigh nothing; it said to the jury, the circular was "an offer to sell:" the telegraphic dispatch was "an acceptance and order," and thereby closed all discussion. It also ignored the relations of the parties arising out of the letters of the 8th, 10th and 11th days of February, and the effect of the word "answer" in Hall's dispatch.

The questions of the measure of damages, or the reasonableness of the order are minor, and it is not proposed to discuss them here. It is difficult to see, however, why the measure of damages was fixed as of February 14th, and not as of an earlier date. The main question is not one of an acceptance by letter, but whether an offer was made by the circular, or if made, whether coupled with a reservation of right on the part of the senders to exercise their discretion in regard to filling any order which should be based upon it, and which discretion was given to them by virtue of long established usage—so far entering into and constituting an element of the circular, that the receiver was obliged to take notice of, and was bounden thereby. The custom of issuing similar circulars has arisen from the enterprise of merchants, and has found favor not only for its convenience, but also for its aid toward intelligent conduct of business. The rules which it is here contended should be applied upon such circulars, derive reason from the nature of them, and are a necessity to their existence. It is for the interest of all that courts should administer as usage has established them.